IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2021 Session

## RICARDO ANTONIO DEMLING v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 2016-CR-18229-PC    M. Wyatt Burk, Judge**
_____

### No. M2019-01822-CCA-R3-PC
_____

The petitioner, Ricardo Antonio Demling, was convicted by a jury of theft of property valued between $10,000 and $60,000, for his involvement in stealing two utility trailer vehicles (UTVs), and sentenced to fifteen years as a Range III persistent offender to be served consecutively to any unexpired sentences.[1] He now appeals from the denial of post-conviction relief claiming ineffective assistance of counsel based on the following grounds: (1) upon receipt of the State's amended discovery response containing a statement by the petitioner and the name Christopher Brown, the alleged owner of a UTV, trial counsel's failure to move to dismiss the charge, failure to suppress the statement by the petitioner, and failure to file a motion to continue the trial; (2) failure to interview and secure the testimony of Christopher Brown; (3) failure to file a motion based on Brady v. Maryland, 373 U.S. 83 (1963), and State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), concerning the alleged destruction of a dash cam recording of the instant traffic stop; (4) failure to file a speedy trial motion to dismiss based on the sixty-seven month delay between the date of the alleged crime and the date of the arrest; and (5) failure to file a motion to dismiss based upon the sixteen month delay between the date of the arrest and the trial.[2] Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JAMES CURWOOD WITT, JR., J., joined.

_____

[1] The Petitioner was tried jointly with his co-defendant, Marvin Devon Summers, the driver of the stolen UTV, who was also convicted and sentenced to ten years' imprisonment. State v. Marvin Devon Summers, No. M2017-00033-CCA-R3-CD, 2018 WL 703095, at *1 (Tenn. Crim. App. Feb. 5, 2018), no perm. to appeal filed.

[2] We have rephrased and renumbered the petitioner's issues for clarity. We also observe there were several other issues raised in the petition and denied by the post-conviction court. As none of those issues are included in this appeal, they are waived.

Gregory D. Judkins, Shelbyville, Tennessee, for the Petitioner, Ricardo Antonio Demling.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

Following his conviction, the petitioner filed a direct appeal to this court challenging generally the sufficiency of the evidence supporting his conviction. He also argued that his sentence was excessive and asked this court to conduct a plain error review of "all objections" and "all issues regarding venue and jurisdiction[.]" State v. Ricardo Antonio Demling, No. M2017-00140-CCA-R3-CD, 2018 WL 618708 (Tenn. Crim. App. Jan. 30, 2018), perm. app. denied (Tenn. June 6, 2018). The proof at trial, as relevant here, is set forth below:

> Roger Dale Smith testified that he owned Smith Equipment in Bedford County. Mr. Smith stated that, in 2009, Smith Equipment's main business was selling lawn mowers, lawn equipment, equipment parts, and utility vehicles. Smith Equipment was an authorized dealer for Cub Cadet Utility Vehicles. On September 27, 2009, Mr. Smith worked late at Smith Equipment and left around 10:30 p.m. The next morning, Mr. Smith arrived at his business around 7:30 a.m. and noticed that a yellow utility vehicle owned by Smith Equipment that had been parked in front of the business was missing. Mr. Smith testified that Smith Equipment purchased the utility vehicle for $7,600 and that the retail value of the utility vehicle was between $9,000 and $9,500. Mr. Smith and his employees checked the inventory of the business and discovered that a second utility vehicle had been stolen. Mr. Smith stated that the second utility vehicle "was parked on the back side of the building where it was [ ] basically ... waiting to be serviced." Mr. Smith explained that a customer, Nathan Walker, owned the second utility vehicle, a green and black utility vehicle with accessories. Mr. Walker did not give anyone permission to remove his utility vehicle from the Smith Equipment property. Mr. Smith testified that Mr. Walker purchased his utility vehicle from Cub Cadet for $11,950 and that the utility vehicle retailed for between $14,000 and $15,000. Mr. Smith explained that the utility vehicles required keys to start and that Mr. Walker kept the key to his vehicle but that the key to the other vehicle was inside Smith Equipment.
>
> ….
>
> Mr. Smith testified that Smith Equipment filed a claim for the stolen utility vehicles on its insurance policy and paid a $1,000 deductible. The insurance

company reimbursed Smith Equipment for the cost of replacing Mr. Walker's utility vehicle. The insurance company later contacted Mr. Smith to inform him that law enforcement had found the stolen utility vehicles, which Mr. Smith turned over to the insurance company.

....

Trooper Willie Allison testified that he had worked for the Tennessee Highway Patrol ("THP") for approximately ten years. On September 28, 2009, Trooper Allison conducted a traffic stop in Clay County at 4:45 p.m. Trooper Allison stopped "a greyish and pink Suburban" with a trailer carrying a green utility vehicle and a yellow utility vehicle. He explained that he stopped the Suburban because the trailer lights were not operating correctly. As Trooper Allison approached the Suburban, he noticed that the vehicle had expired "dealer tags." Trooper Allison checked to see if the dealer tag belonged to the Suburban, and he found that Bridgett Allison owned the Suburban and that the dealer tag originated from a dealership in Nashville. Trooper Allison testified that co-defendant Summers was driving the vehicle and that the [petitioner] was in the passenger seat. Trooper Allison separated the [petitioner] and co-defendant Summers and asked them about the utility vehicles. Both individuals informed Trooper Allison that they had been hired to transport the utility vehicles from Shelbyville to Kentucky; however, they could not identify the individual who hired them to transport the items or where in Kentucky they were supposed to transport the vehicles. Trooper Allison noted that individuals who hauled vehicles for hire needed special tags on their vehicle and trailer and that the [petitioner] and co-defendant Summers did not have the required tags on their vehicle or their trailer. Trooper Allison also stated that the [petitioner] and co-defendant Summers did not have keys for the utility vehicles, bills of sale, or other proof of ownership.

On cross-examination, Trooper Allison explained that the [petitioner] and co-defendant Summers did not tell him that they had been hired to transport the utility vehicles to Celina after the owner's vehicle broke down in Lebanon. Trooper Allison checked the traffic log and did not find any log entry for a "motorist assist" for that day. Trooper Allison testified that he arrested co-defendant Summers for driving on a revoked license and transported him to the Clay County Jail. He was unsure of how the [petitioner] was transported to the jail.

Demling, 2018 WL 618708, at *2.

In affirming the conviction, this court highlighted the proof that showed the physical descriptions and VINs of the UTVs on the petitioner's trailer matched the description and VINs of the UTVs stolen from Smith Equipment, and that Trooper Allison had stopped the petitioner on the same day that Mr. Smith discovered the UTVs had been stolen from Smith Equipment. Demling, 2018 WL 618708, at *4. We also determined that the petitioner had waived his general invitation to this court to review "all objections" and "all issues regarding venue and jurisdiction" because it was not supported by argument or citation to the record. Id. at *6.

On March 27, 2019, the petitioner filed a pro se petition seeking post-conviction relief based on thirty-two separate grounds. On April 5, 2019, the post-conviction court entered a preliminary order on the petition and appointed post-conviction counsel. On June 3, 2019, the State filed a response denying all claims in the pro se petition and stating that the grounds for relief relied upon by the petitioner "had been previously determined and/or waived." An amended petition, incorporating the pro se petition, was filed on August 1, 2019. On August 6, 2019, the State filed its response, again denying all of the petitioner's claims. On September 5, 2019, the post-conviction court conducted an evidentiary hearing during which the petitioner, trial counsel, and trial counsel for co-defendant Summers testified.

The petitioner denied he was guilty of the theft in this case. He agreed that he was a passenger in the Suburban carrying the stolen UTVs on the day of the offense but denied any knowledge the UTVs had been stolen. According to the petitioner, the Suburban they were driving belonged to the niece of his co-defendant, Marvin Summers. At the time of the stop, he thought he was towing equipment belonging to an individual named Christopher ("Chris") Brown. Earlier in the day, he had received a call from Christopher Brown asking for assistance because his vehicle had broken down. The petitioner did not have a truck to assist Brown, so the petitioner walked four houses down to co-defendant Summers' home, who agreed to drive the Suburban to assist Brown. When they arrived at the location to meet Brown, they detached the trailer with the UTVs from Brown's vehicle to their Suburban and began to follow Brown to his home in Celina, Tennessee. Brown was ahead of them, riding in a gold Maxima driven by his wife. About two hours later, the petitioner and co-defendant Summers were stopped by Trooper Allison. When they were stopped, Brown continued to drive and did not return until sometime later. Brown eventually returned, but the trooper refused to allow him to take the UTVs because he did not have documentation of ownership of the UTVs. Co-defendant Summers was arrested for driving without a license, and the petitioner was "released to Christopher Brown."

When Brown returned, Trooper Allison's vehicle was behind Summers' Suburban and Brown's vehicle was in front of Summers' Suburban. Asked "if there was a dash

camera, [Brown] would have been visible in the video[?]," the petitioner replied, "Yes, sir." The petitioner said the entire exchange between Trooper Allison and Brown would have been captured on the dash cam video. The petitioner believed the dash cam video was significant because it would have shown Brown claiming ownership of the UTVs and that the petitioner had Brown's permission to possess them. He never talked to Brown again after the day of the offense, and he did not return to Celina until twenty-five days later when he, along with Summers' niece, got the Suburban out of the impound lot. The petitioner said he did not hear about the UTVs again until he was arrested on May 12, 2015, almost five and a half years later.

The petitioner agreed he was not indicted regarding the theft until March 21, 2016. For the period between his arrest and indictment the petitioner had made bond and was "going back and forth to court here." He said that he met with trial counsel "[j]ust one time." He had explained the series of events to trial counsel and had given him Brown's name "early on" or within three months of trial counsel being appointed to his case. He said trial counsel did not express any interest in trying to find Brown. Trial counsel explained the discovery process to the petitioner, and the petitioner was aware he had filed a discovery request. However, the State's initial discovery response did not include the name or address for Christopher Brown. Asked how the petitioner knew Brown, the petitioner replied, "His wife worked a previous job with my kids' mother." The petitioner did not have Brown's address at the time of the post-conviction hearing.

The petitioner agreed that on September 7, a week before trial, the State amended their discovery response to include a statement the petitioner considered to be "detrimental" to the case. Trial counsel did not discuss how they could have responded to the amendment or whether they could have filed a motion to dismiss based on the State's late-filed discovery. The petitioner stated that he was shown a "piece of paper that said I left the scene – I mean that Christopher Brown picked me up from the jail. He showed me that. I asked him where that came from. And he said the prosecution had that statement. And I asked him where he got the statement from. He never could tell me." Post-conviction counsel then read into evidence the State's amendment to discovery:

> (As Read) If there is a trial in this case, the State intends to offer evidence, an oral statement made by defendant in response to an interrogation to a person then known to the defendant to be a law enforcement officer, the substance of which is as follows: Both defendants were asked by Trooper Allison about the UTVs and where they were headed with them. Each defendant replied that they had picked the UTVs up in Shelbyville and were paid to deliver them to a guy in Kentucky. The defendants were asked the name of the individual in Shelbyville and Kentucky and neither defendant

could provide names. Neither defendant mentioned having mechanical problems earlier in the day on Interstate 40.

The petitioner agreed that if the above conversation had taken place, it would have been captured on the dash cam video of Trooper Allison's vehicle. The petitioner said that he did not seek any continuances in the process of his case and that he told trial counsel he wanted to bring his case to trial as quickly as possible. By the time of his trial, the petitioner had no way of finding Brown. The petitioner also said trial counsel did not adequately cross-examine the victim concerning the value of the UTVs. The petitioner did not believe the property was appropriately valued because the victim "had the opportunity to recover that property, [but] they chose to stay with what the insurance company gave them." According to the petitioner, the victim never stated how much he received from the insurance company and trial counsel failed to ask him how he determined the value of the trailer. The petitioner was concerned because trial counsel failed to make any objections at all during his trial.

On cross-examination, the petitioner reluctantly agreed that on the day of trial, he declined to testify stating, "I've had brain surgery twice since then. I can barely remember my own name. I couldn't spell my name right at that time." The State pressed the petitioner regarding the existence of the dash cam video, and the petitioner insisted that it existed based on the testimony of Trooper Allison. The State clarified that based on Trooper Allison's trial testimony, the video was "taped over." The petitioner agreed while Trooper Allison may not have personally destroyed the video it was in fact destroyed after three years. The petitioner reviewed the general sessions warrant for his arrest in this case which reflected a "conditional forfeiture issued on 10/14/2015." He agreed this meant his bond had been forfeited and explained it may have been because he "got in trouble in another state. . . . [n]ot because I got in trouble here[.]" The petitioner also agreed that he provided a statement of what happened at the time of the offense in his pre-sentence report and blamed his drug habit for the offense and did not include a claim of innocence. He did not recall telling trial counsel he wanted to "put off" or "slow walk" his case because he was on bond.

Trial counsel for the codefendant testified that he and trial counsel for the petitioner met with the petitioner and codefendant Summers several times to discuss trial strategy. Asked what the petitioner's recollection of the events were, trial counsel for the codefendant said, "[H]e had no recollection, Your Honor." The petitioner told him on several occasions that he could not help them because the petitioner could not remember anything about the events on the day of the offense. Trial counsel for the codefendant said there was never any mention of a Chris Brown; however, trial counsel did recall "somebody had broke[n] down on the interstate." He recalled at some point the State provided them with the name Chris Brown, and he made unsuccessful inquiries into who this person was.

Trial counsel for the codefendant was familiar with the video recording systems used by law enforcement. He filed a motion to get the dash cam video in this case and determined that "there wasn't one." He did not file a motion to dismiss for lack of a video because he did not know what was on the video or if it would have been relevant.

Trial counsel for the petitioner testified that he represented the petitioner from general sessions court to trial in this case. He filed a motion to dismiss based on a lack of venue which was denied. He said the petitioner was unable to assist in the development of the case because the petitioner "had a self-inflicted gunshot wound." Trial counsel said the first time he heard the petitioner's version of the offense claiming Chris Brown was the true owner of the stolen trailer was at the post-conviction hearing. Trial counsel agreed the petitioner never mentioned Chris Brown during their preparation for trial. Trial counsel said, even assuming a video existed, there was no reason to believe it contained exculpatory information. Trial counsel could not recall when he first became aware of Chris Brown. He believed the name may have been provided to him in the State's discovery. Upon learning the name Chris Brown, trial counsel made unsuccessful attempts to locate him. Trial counsel insisted the petitioner never advised him of Chris Brown. A January 27, 2017 letter from trial counsel to the petitioner was admitted into evidence and noted, in relevant part, as follows:[3]

> It doesn't matter how many times that you ask me for a document about Christopher Brown, I still won't have anything other than where the name appears in discovery; You reference him directly because you have a copy of the discovery which was given to you a total of three times now. Nonetheless, I attach another copy of the page contained in the discovery which you seem to directly reference. It seems that you are asking repeatedly for the same document, one that you already possess. I'm really not sure where the name Christopher Brown originally came from. I thought that you were the source and based on what you said, we tried to find information about him through an additional discovery request and I researched him on the internet. I do remember that it was asked about during cross-examination during the trial and my recollection, not having access to the transcripts at this point, is that nobody knew any Christopher Brown. I believe that the Trooper said that the tow-truck driver gave you a ride, not Mr. Brown. Gladly I will examine the trial transcript with the Christopher Brown name in mind.

> As far as your recollection goes, you told me that you recall nothing from the theft because of your failed attempt at suicide which resulted in

---

[3] The record reflects the trial in this case occurred on September 12-13, 2016.

extensive brain damage. If you are now claiming to remember things, then that seems a little disingenuous, just saying.

Asked why trial counsel did not move to suppress Trooper Allison's statement, trial counsel said (1) it would not have made a difference to his trial strategy; and (2) he used the lack of video to discredit Trooper Allison and the State's case. Trial counsel did not believe the State manufactured the delay in the petitioner's arrest to gain any tactical advantage. Asked why he did not file a motion for speedy trial, trial counsel replied, the petitioner was on bond and that would have been "contrary to his desires." Moreover, following the petitioner's arrest, trial counsel recalled a "direct request from [the petitioner]" to "slow walk" the case.

On September 11, 2019, the trial court entered an order denying post-conviction relief. The order included a twenty-seven-page memorandum of law addressing each of the issues raised in the petition and setting forth the court's reasoning and analysis. On October 10, 2019, the petitioner filed a notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

The petitioner claims he is entitled to post-conviction relief because he was deprived effective assistance of counsel based on the following grounds: (1) upon receipt of the State's amended discovery containing a statement by the petitioner and the name Christopher Brown, the alleged owner of the UTVs, trial counsel's failure to move to dismiss the charge, failure to suppress the statement by the petitioner, and failure to file a motion to continue the trial; (2) failure to interview and secure the testimony of Christopher Brown; (3) failure to file a motion based on Brady v. Maryland, 373 U.S. 83 (1963), and State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), concerning the alleged destruction of a dash cam recording of the instant traffic stop; (4) failure to file a motion to dismiss based on the sixty-seven month delay between the date of the alleged crime and the date of the arrest; and (5) failure to file a motion to dismiss based upon the sixteen month delay between the date of the arrest and the trial. We will address each issue based on the following well established law.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of

competence demanded of attorneys in criminal cases. Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010).

In order to prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402

S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The petitioner first argues that upon receipt of the State's amended discovery response containing a statement by the petitioner which contained the name and address of Christopher Brown, the alleged owner of the UTVs, trial counsel was ineffective in failing to file motions to dismiss the charge, to suppress the statement by the petitioner, and/or to continue the trial. In response, the State points out that trial counsel testified at the post-conviction hearing that he did not file these motions because they were without merit and that he made efforts to locate Christopher Brown but was unsuccessful. The State also asserts that the petitioner has failed to establish prejudice because he has not shown any of the motions would have been successful or that they would have changed the outcome of the petitioner's case. We agree with the State.

In regard to this issue, the post-conviction court determined as follows:

Specifically, the [petitioner] argues that Trial Counsel failed to object to a "late produced" incriminating oral statement allegedly made by Petitioner to Trooper Willie Allison regarding how Petitioner came into possession of the subject property and what he was supposedly doing with the subject property. The Court, after hearing the testimony of Trial Counsel affirms that said statement was not introduced as an exhibit at trial. The Defendant certainly cannot state that he was "unfairly" surprised at trial, and he was able to cross-examine Trooper Allison regarding his testimony. Trial Counsel indicated that the state produced this statement prior to trial, after the "venue motion." Trial Counsel indicated that the production of this statement prior to trial did not change the [petitioner's] trial strategy or tactics whatsoever. Furthermore, as a trial tactic, Trial Counsel attempted to use the lack of the "video" together with the statement in order to attempt to show that the State was playing "hide the ball" and attempted to confuse the jury on this issue. Trial Counsel was not deficient in this regard, and his performance cannot be said to be below a reasonable standard. This issue is without merit.

Second, the Defendant argues that Trial Counsel failed to object to the "late produced" "identity and address of Christopher Brown who was at the scene of the stop and claimed the subject property belonged to him and verified that Petitioner had Mr. Brown's consent to be in possession of the

subject items of property." The Court, after reviewing the transcript and the testimony adduced, at the PC hearing, determines that Christopher Brown never existed. Trial Counsel scoured the internet and searched extensively for "Christopher Brown" and his efforts did not yield any usable information. Furthermore, "Christopher Brown" was not called as a witness at trial, nor was he called as a witness at the PC hearing. Prior to trial, Trial Counsel confirmed that the Defendant and the co-defendant never discussed "Christopher Brown", and Defendant could not "remember" anything about the incident due to his self-inflicted gunshot wound to his head and resulting "brain surgery." Trial Counsel simply cannot be responsible for locating and securing an alleged witness that simply did not exist. This issue is without merit.

The petitioner argues contrary to the finding of the post-conviction court that the statement in question was admitted at trial. Our review of the record shows the following exchange between the State and Trooper Allison occurred at trial:

Q. Okay. And what did [the petitioner and the co-defendant] tell you about these UTVs?

A. They both told me the same story. They said that they were hired from Shelbyville, a man, to haul these two side-by-sides to Kentucky.

Q. All right. And did you ask them if that was something they did on a regular basis?

A. They said that's what they usually do. That they, they take odd jobs like that and hire, you know, take odd jobs and take things for people, I guess.

Q. All right. And, of course, if that's a business and that's what you're doing, would it require a special plate on the trailer?

A. Yes, and on the truck. You need a H tag on the truck and you need a trailer tag, if you're using both of them for business use.

Q. All right. So, if they were doing that, did they have those, either of those?

A. No.

Q. Okay. Now, were they able to identify to you this person who had asked them to haul the vehicle?

- 11 -

A. No. They didn't know their name. They didn't know his name.

Q. All right. So, they -- so, this individual who had supposedly hired them, they didn't even know who, didn't even give you a name?

A. No.

Q. All right. Were they able to tell you where they were taking them to?

A. They just said somewhere in Kentucky.

Q. Did they know, were they able to tell you where in Kentucky they were taking them?

A. No.

Q. So, they'd been hired to take these vehicles to Kentucky, but they can't tell you where it's at?

A. That's correct.

Q. Okay. Did they, were they able to produce the keys to them or did you find the keys to these vehicles?

A. No, there were no keys to those things.

Q. All right. Eventually, was this car and these, trailer and the UTVs or the side-by-side, were they eventually all towed away?

A. They were. I had them, because since they were not the owner of the vehicle, they couldn't show proof of any kind of bill of sale or anything, since they were not owners of the side-by-sides or the trailer, I had it towed and placed a hold on it for, for ownership, for the owner to come and get it.

Q. All right. And as it's being towed, did they say, Hey, can you give this guy a call and tell him where his UTVs are?

A. I don't recall that at all.

On cross-examination, however, Trooper Allison testified as follows:

- 12 -

Q. Okay. Did [the petitioner or the co-defendant] either one, mention anyone that had hired them to take these vehicles to Celina?

A. If they did, I don't recall it.

Q. You don't remember anything about a conversation with either of these two gentlemen about a vehicle breaking down at I-40 in Lebanon and being hired to take these vehicles to Celina?

A. No, sir.

Q. You don't remember any of that? Okay.

A. No, sir. That was never brought up at the time of the stop –

….

Q. Do you have any idea who this Christopher Brown person is that, is that a name that you're familiar with?

A. No, sir.

The post-conviction court's confusion on this issue appears to lie in the precise statement the petitioner sought to have excluded, which is not entirely clear. Trooper Allison stated that the petitioner and the codefendant said they were hired by an unnamed man to haul the UTVs to Kentucky. He denied that the petitioner and co-defendant stated they were hired to haul them to Celina and did not recall any mention of a vehicle having broken down or Christopher Brown. Based on the above testimony, we agree with the petitioner and conclude that the information provided by the State in their amended discovery response was admitted at trial. This conclusion offers no basis for relief; however, because trial counsel stated that he used the information in the amended discovery to his advantage in attempting to cast doubt on the State's case. We additionally observe that the petitioner hinges the bulk of his claims in his petition on Christopher Brown, alleging that Brown's testimony would have been exculpatory because he was the true owner of the UTVs. This is problematic because the undisputed proof at trial established that the true owners of the UTVs were Roger Dale Smith and Nathaniel Walker. As such, even if we believed that Brown existed and was present at the time of the traffic stop, the petitioner cannot account for his joint possession of the UTVs only hours after they had been reported stolen on the same day. In other words, the petitioner ignores the concept of criminal responsibility, which was charged to the jury and would have similarly

- 13 -

supported the conviction in this case. Accordingly, for this and the reasons set forth in the order of the post-conviction court, the petitioner has failed to establish deficient performance of trial counsel in failing to file these motions or prejudice arising therefrom. He is not entitled to relief.

Next, the petitioner claims trial counsel was ineffective in failing to interview and secure the testimony of Christopher Brown. The post-conviction court denied relief as to this claim due to the petitioner's failure to present Christopher Brown as a witness at the post-conviction hearing. As articulated by the post-conviction court, this court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. While the petitioner attempts to distinguish his case from the rule in Black, we are unpersuaded. See Tavarus U. Williams v. State, No. 02C01-9711-CR-00423, 1998 WL 742348 (Tenn. Crim. App. Oct. 23, 2009).

In Tavarus Williams, this court determined that trial counsel's negligence prevented the petitioner from calling the missing witness at the post-conviction hearing and therefore reversed the post-conviction court's denial of relief. The court reasoned:

> We recognize that this witness' proposed testimony should have been produced at the post-conviction hearing under the general rule announced in Black v. State. However, we think it is fundamentally unfair to hold this failure of proof against [Williams] and, therefore, find the Black rule inapplicable under the facts of this case ...
>
> The best evidence that [Williams] had of the crucial testimony was [the investigator], and he did produce that proof at the hearing. Accordingly, because [Williams] produced independent proof of vital testimony that

- 14 -

would have been available at the hearing but for his trial lawyer's ineffectiveness (in never discovering the witness, not calling him and losing all record of him), we hold that [Williams] has established both prongs of the Strickland test.

Id. at *6-7 (internal citations, footnotes, and quotations omitted).

In stark contrast to Williams, the proof at the post-conviction hearing established that the petitioner could not remember anything about the date of the offense due to a self-inflicted gunshot wound to his head. This was also reflected at trial during the Momon hearing and corroborated by trial counsel and counsel for the codefendant. We acknowledge that the State provided trial counsel with the name and address for Christopher Brown five days prior to trial; however, it is difficult for this court to attribute much significance to this amendment when trial counsel did not know who Christopher Brown was or how he would aid in his case. In any event, trial counsel testified that he searched for Christopher Brown and was unable to locate him. Trooper Allison also testified at trial that he did not know who Christopher Brown was. Because the petitioner failed to present Christopher Brown at the post-conviction hearing, he is not entitled to relief as to this issue.

In his third claim, the petitioner argues trial counsel was ineffective in failing to file a Brady or Ferguson motion concerning the alleged destruction of a dash cam recording of the instant traffic stop. The post-conviction court determined as follows:

In the case of State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), the Tennessee Supreme Court adopted a test for courts to use in determining whether the loss or destruction of evidence in the State's possession deprived the defendant of a fair trial. The initial inquiry is whether the State had a duty to preserve the evidence. Whatever duty the Constitution imposes on the State to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates that the State failed in its duty to preserve evidence, the analysis moves to a consideration of several factors which guide the decision regarding the consequence of the breach. Those factors include "(1) the degree of negligence involved; (2) the significance of the

- 15 -

destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction." Id. If a trial without the missing evidence would be fundamentally unfair, the trial court may dismiss the charges, give a jury instruction, or "craft such orders as may be appropriate to protect the defendant's fair trial rights." Id. See also State v Merriman, 410 S.W. 3d 779 (Tenn. 2013).

The Court will first consider as to whether the State had a duty to preserve the evidence. As previously mentioned, whatever duty the Constitution imposes on the State to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)). At trial, Trooper Allison testified that the initial stop of the Suburban was for a light law violation with regard to the trailer hauling the UTVs. See Trial Transcript pg. 64, line 25 and pg. 77, lines 23-24. After issuing a citation for driving on revoked license and violation of light law, the Suburban, trailer, and UTVs were towed away from the scene, given the fact that the [petitioner] and co-defendant could not produce ownership documents for said items. Trooper Allison testified that he spoke with no other person at the scene other than the [petitioner], co-defendant, tow truck driver, and his Sergeant. Further, Trooper Allison did not run the UTVs' VIN numbers through NCIC because he could not locate them on the UTVs. Once they left his presence, the UTVs remained with the tow truck driver. When asked about the "video of the stop," Trooper Allison testified that he was driving a "Ford Crown Vic" that was equipped with a dash cam. The camera at that time was of the "little cassette" version, not digital. Trooper Allison indicated that he did not destroy the video, but presumably, the video rolls off after "about three (3) years." As such, it is not clear to the Court as to whether the video even existed, or whether the camera actually captured the stop. Trooper Allison never indicated that he "viewed" the video. Furthermore, Trooper Allison testified that he believed that he had no reason to preserve the dash cam video. His involvement with the matter was simply for a stop and citation for violation of light law and driving on revoked license. Trooper Allison testified that he was only made aware of the arrest of the [petitioner] for theft "a few months before trial." However, at trial, Trial Counsel attempted to impeach Trooper Allison with the "destruction" of the video. After

questioning him regarding his phone conversation with Detective Ferris "a couple of weeks after the stop," Trial Counsel was able to argue that the video was "destroyed" after Trooper Allison had an indication that the UTVs were stolen: In considering the evidence presented at trial and at the PC hearing, the Court does not believe that the video contained any exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; therefore, the State had no duty to preserve the video. The State has no absolute duty to record the stop, and furthermore, there is no proof which clear[ly] and convincingly establishes that the stop was ACTUALLY recorded. The only concrete thing we know is if it was recorded, it was purged after a period of three (3) years.

However, out of an abundance of caution, the Court will also consider an alternative holding. If the Court held that the video may have contained some exculpatory value and should have been preserved by the State, the analysis moves to a consideration of several factors which guide the decision regarding the consequence of the breach. Those factors include "(1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction." Id. In this case, there is no proof that the "destruction of the dash-cam video" was done in bad faith. Further, when potentially exculpatory evidence is lost or destroyed negligence is presumed. Merriman, supra, at 793. However, based upon the testimony, it appears to be unintentional and amounts to simple negligence. Regarding the significance of the evidence, the potential exculpatory value appears to be to refute Trooper Allison's assertion that there wasn't a third party at the scene of the stop. The Defendant contends that "Christopher Brown" was present. However, in considering the "the sufficiency of the other evidence used at trial to support the conviction," the Court concludes that there was other sufficient evidence to prove the State's case at trial. Again, this is not a case wherein the State's case hinges upon the dash-cam footage of the patrol car. The Tennessee Court of Criminal Appeals affirmed that sufficient evidence exists to support the conviction, and therefore this prong has been adequately tested.

After a review of the forgoing, the Court is of the opinion that dismissal of charges is really reserved for the most egregious of situations, particularly involving gross negligence or intentional acts. This situation involved a simple failure to retrieve footage that "rolled-off" the server in a

three (3) year period. Such conduct is not gross negligence or an intentional act.

As Trial Counsel and Atty. Parker indicated at the PC hearing, they did not believe that the State had a duty to preserve the traffic stop video. Based upon Atty. Parker and Trial Counsel's interviews with their clients, as well as all other evidence that existed prior to trial, Trial Counsel did not believe that said video, if it existed, would have contained any exculpatory evidence or value. The initial stop by Trooper Allison was for a trailer tail light violation and an arrest for revoked license. It cannot be said that Trial Counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Furthermore, the Court cannot hold that Trial Counsel's failure to file a motion to dismiss based on the loss of the video was deficient performance. Given the fact that trial counsel cross-examined Trooper Allison regarding the "destruction" of the video and the circumstances surrounding the timing of its "destruction," it would appear that the failure to file a motion to dismiss was a tactical decision. The issue of the lost video was hotly litigated and Trial Counsel attempted to plant seeds of doubt and distrust in the minds of the jury regarding the truth and veracity of Trooper Allison's testimony. Petitioner has failed to show that Trial Counsel's performance was in any way deficient. Petitioner is not entitled to relief on this issue.

The record does not preponderate against the determination of the post-conviction court. The petitioner has failed to establish deficient performance or prejudice arising from trial counsel's failure to file a motion pursuant to Brady and Ferguson. Accordingly, we affirm the findings of the post-conviction court and conclude that the petitioner is not entitled to relief as to this issue.

As his fourth ground for relief, the petitioner argues trial counsel was ineffective in failing to file a motion to dismiss based on the sixty-seven-month delay between the date of the alleged crime and the date of the arrest. The post-conviction court determined "there was a substantial delay in the ultimate arrest of the [petitioner]" but that the petitioner had failed to show that the State had caused the delay in order to gain tactical advantage over or to harass the petitioner. In United States v. Marion, 404 U.S. 307 (1971), the United States Supreme Court explained that "[t]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to the [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324-25. In State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990),

- 18 -

the Tennessee Supreme Court adopted the <u>Marion</u> approach to determining when a defendant is entitled to relief for pre-indictment delay and held:

> Before an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

<u>Dykes,</u> 803 S.W.2d at 256 (citing <u>United States v. Marion,</u> 404 U.S. at 324). Our supreme court reaffirmed the applicability of the <u>Marion–Dykes</u> rule in <u>State v. Utley,</u> 956 S.W.2d 489 (Tenn. 1997), noting that in "cases involving a pre-arrest delay, the due process inquiry continues to be guided by <u>Marion.</u>" <u>Id.</u> at 495. The <u>Utley</u> court held that prejudice "cannot be presumed and instead must be substantiated by the defendant with evidence in the record" and that "the due process inquiry under <u>Marion </u>also requires proof regarding the State's use of the delay to gain tactical advantage." <u>Id.</u>

The petitioner points out "[f]rom January 14, 2010, when the warrant was obtained, until the actual arrest date for this charge of May 9, 2015, [he] was arrested and charged with other crimes in [the state] on seven occasions." He further avers he actively participated in probation and community corrections in Tennessee and yet there were no significant efforts made to prosecute him for over five years. He insists he was prejudiced by the State's failure to prosecute based on the destruction of the dash cam video and the unavailability of Christopher Brown. He acknowledges, while there was no evidence that the State intentionally delayed the prosecution to gain a tactical advantage over the petitioner, but cautions that this burden of proof has been viewed by the Tennessee Supreme Court as "daunting, almost insurmountable[.]" <u>See</u> <u>State v. Gray,</u> 917 S.W.2d 668, 673 (Tenn. 1996). The petitioner then employs the suggestion by this court in <u>State v. Ahmad R. Manning</u>, No. E2011-01812-CCA-R3-CD, 2013 WL 794154 (Tenn. Crim. App. Mar. 4, 2013), <u>perm. app. denied</u> (Tenn. Sept. 11, 2013), that applied a <u>Ferguson</u>-type negligence analysis, and concludes that the petitioner could have "possibly prevailed in having the Theft charge dismissed."

In <u>Ahmad R. Manning</u>, the trial court dismissed the indictment because the two-year delay between the offenses and the indictment gave the State an "[a]lbeit unintentional" advantage over the defense. On appeal, this court concluded that the trial court erred by dismissing the indictment under the <u>Marion-Dykes</u> test because "the trial court must find that the State intentionally delayed the proceedings in order to gain a tactical advantage or to harass the accused." <u>Id.</u> at *5. In reversing the trial court's dismissal of the indictment, however, this court expressed concern as to "whether in reality the <u>Marion-Dykes</u> rule affords a defendant meaningful protection of his due process right

to a fair trial in the face of unreasonable and unjustified pre-indictment delay" and suggested a "Ferguson-type analysis" for such cases. Id. at *6. This court did not incorporate Ferguson into its own analysis of the issue, and our supreme court denied the defendant's application for permission to appeal. Id. at *7. Accordingly, we remain bound by the Marion-Dykes rule and apply it to the instant case.

The post-conviction court determined, and the petitioner concedes, there was no proof that the State intentionally caused the delay in order to gain tactical advantage over or to harass the petitioner. In addition, although the petitioner relies on his somewhat specious claim that Christopher Brown and the dash cam video capturing the traffic stop would have been exculpatory, there was no proof of such at the post-conviction hearing. Accordingly, the petitioner failed to establish he sustained actual prejudice as a direct and proximate result of the delay. The petitioner is not entitled to relief as to this issue.

As his fifth and final ground for relief, the petitioner argues trial counsel was ineffective in failing to file a motion to dismiss based upon the sixteen-month delay between the date of the arrest and the trial. The post-conviction court determined "the sixteen (16) month delay in this case [was] sufficient to raise the Barker analysis." However, the post-conviction court found "the [petitioner] did not assert his right to a speedy trial . . . [and] specifically instructed Trial Counsel to 'slow walk' this matter, as the [petitioner] was out on bond, and was 'dealing with other legal matters.'" In denying relief, the post-conviction court considered the petitioner's action in doing so as "the very definition of 'unclean hands.'"

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. See U.S. Const. amend VI; Tenn. Const. art. 1, § 9. The right to a speedy trial is also statutorily protected in Tennessee. See T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel."). In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v.United States, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury. State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001) (citing Utley, 956 S.W.2d at 491). When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514

(1972). See also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee). The Barker factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759. "The factors relevant to a speedy trial inquiry are interrelated and depend upon the particular circumstances of each case." Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis."). If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83.

The petitioner was arrested on May 9, 2015, and his trial occurred on September 12-13, 2016. The length of the delay in this case is one year and four months, which is sufficient to trigger the speedy trial analysis. Next, we must consider the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); see also Simmons, 54 S.W.3d at 759. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d at 346-47; see also Barker, 407 U.S. at 531. It appears that the petitioner was arrested on May 9, 2015, and posted a $5000 bond. On October 22, 2015, an order granting conditional forfeiture of the petitioner's bond was entered. The petitioner explained this meant his bond had been forfeited and explained it may have been because he "got in trouble in another state . . . [n]ot because I got in trouble here[.]" On March 21, 2016, an order of arraignment and continuance was entered appointing trial counsel and setting the matter for trial or disposition on April 15, 2016. On April 15, 2016, an order from status review was filed by the trial court setting an April 29, 2016 discovery deadline. Trial counsel did not attribute the delay as an intentional effort by the State to gain a tactical advantage over the defense. Moreover, although the petitioner claimed he did not acquiesce to any of the continuances in this case, trial counsel stated that the petitioner specifically requested his case to be "slow walked" because he was dealing with other matters and on bond. We find the reason for the delay to be weighed against the petitioner.

In assessing what, if any, prejudice the petitioner suffered as a consequence of the delay, the petitioner asserts the loss of the dash cam video, the testimony of Christopher Brown, and the opportunity to have his sentence served concurrently to his previous sentences. However, as previously addressed, the dash cam video did not contain information requiring the State to preserve it, and, despite the protestations of the petitioner

- 21 -

otherwise, Christopher Brown was not the lawful owner of the UTVs. After applying the <u>Barker</u> balancing test, we conclude that the petitioner's right to a speedy trial was not violated. Accordingly, the petitioner has failed to establish deficient performance or prejudice arising therefrom. He is not entitled to relief.

## **CONCLUSION**

Based on the foregoing reasoning and analysis, the judgment of the post-conviction court is affirmed.

_____

CAMILLE R. MCMULLEN, JUDGE